ANDREW J. NUTTING, Respondent, *v.* THE KINGS COUNTY ELEVATED RAILWAY COMPANY, Appellant.

*Railroad corporations — contract with, in relation to damages for easements taken — its attorney cannot bind a corporation — proof required to establish the contract — setting aside verdicts against corporations.*

The law imposes upon the plaintiff the burden of establishing his cause of action by a preponderance of proof, and where he asserts an agreement he must sustain his position with reasonable certainty by evidence which justifies the court and jury in deciding in his favor.

An attorney who is acting for a corporation has no power as such to make a contract which can be enforced against the corporation.

A person who deals with the agent of a corporation is bound to know the extent of the authority of the agent of the corporation, and if he sues upon an offer or

promise made by such agent he is bound to show that the agent was either authorized to make such offer or promise or that the acts of the agent were acquiesced in or ratified by the corporation.

There is no reason why there should exist in the appellate court any hesitation in reversing a judgment based upon the verdict of a jury in an action against a corporation.

APPEAL by the defendant, The Kings County Elevated Railway Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 13th day of March, 1895, upon the verdict of a jury rendered by direction of the court after a trial at the Kings County Circuit, and also from an order entered in said clerk's office on the 13th day of March, 1895, denying the defendant's motion for a new trial made upon the minutes.

*Delos McCurdy*, for the appellant.

*Edward M. Grout*, for the respondent.

DYKMAN, J. :

This action is for the recovery of the sum of $9,000 which, it is claimed, the defendant agreed to pay the plaintiff for his consent to the construction and operation of its railroad in front of his premises in Fulton street in the city of Brooklyn, and for the postponement of an argument in the Court of Appeals. There is no allegation in the complaint and no proof in the evidence of the value of the easements taken or impaired by the acts of the defendant or of the damage resulting from the construction and operation of the defendant's railroad. The action is not based upon an impairment of the easements appurtenant to the plaintiff's property, but is founded solely upon an agreement of the defendant to pay the plaintiff the sum of $9,000. While it may be true that the consent of the plaintiff to the construction of the road operated as an irrevocable license and an abandonment by him of the easements appurtenant to his property, and that he was entitled to payment therefor, that fact does not affect the case as it is now presented.

The plaintiff did not abandon his claim for damages, and is entitled to compensation for the consequential injury resulting to his property from the acts of the defendant if any injury has resulted therefrom. But the damages must be liquidated and fixed in some

legal mode.  He might have sued the company for his damage, but he has not done so.  He has brought a suit for the recovery of $9,000, based upon a special agreement to pay him that sum.

The cause was tried at the Circuit before a jury, and at the close of the testimony the trial judge submitted this question to the jury: " I want you to answer this question: Did the defendant agree with the plaintiff that it would pay him $9,000 in settlement for its right of way in front of his property in Fulton street, and for his damages from the construction and operation of its road, if he would consent to the adjournment of his appeal in the condemnation proceedings until such time as the appeal in the Union Elevated case was reached.  If so, you will mark 'Yes' on that paper; if not, you will mark 'No.' "

There was an exception taken by the defendant to this manner of submitting the case to the jury, but the jury retired and returned with the word "yes" written on the paper.  Thereupon the justice directed the jury to find a verdict for the plaintiff against the defendant for $9,000, with interest from November 27, 1888.  The verdict was then directed against the defendant for $12,400.  To the direction of the verdict an exception was taken, and a motion was made for a new trial upon the minutes, which was denied.

The special finding of the jury is that the defendant agreed to pay the $9,000 in settlement for the right of way in front of the property of the plaintiff, and for his damages resulting from the construction and operation of the railroad, provided he would consent to the adjournment of his appeal (meaning doubtless the argument of the appeal) in the condemnation proceedings.

Upon the appeal from the order denying the motion for a new trial on the minutes of the court, we must examine the testimony to find whether it was sufficient to justify the direction of the verdict.

The law imposed upon the plaintiff the burden of establishing the cause of action set up in his complaint by a preponderance of proof. Having affirmed the existence of the agreement, he was required to sustain his position with reasonable certainty by evidence which would justify the court and jury in deciding in his favor.  We will see if he did.  But two witnesses gave testimony respecting the agreement, the plaintiff and his lawyer.  The latter said nothing about the agreement, except that Judge Shea gave him a letter

and told him to meet Judge Russell, and tell him the agreement that had been made. Of course that proved nothing, and the sole support of the verdict must be sought in the testimony of the plaintiff, to which we will now turn. He states his ownership of the property, the construction of the railroad in front of it, and that he signed a written consent therefor, and such consent was read in evidence. It left unaffected the plaintiff's right to and the extent of his compensation. He next stated what he said to the person who solicited his signature, whose name he did not know. He said, " I inquired if they were paying any of the Fulton street property owners. He said they were not. I said, I am willing to sign, but if they pay any of the others, I want the railroad company to pay me the same. He said they certainly would." Subsequently he had a conversation with Mr. Goodwin, the vice-president of the railroad company, in which he (the plaintiff) stated to him that the railroad company had paid others, and named persons who had been paid ten per cent on the assessed valuation of their property, and asked that it should pay him.

He said that Goodwin stated that one of the two directors were in Europe, but that at their first meeting the plaintiff's case would be brought up, and he could rest assured that they would treat him fairly and right. That was in 1887.

He testified that he saw Goodwin some time after, and that the very same thing was said then; that they were to get together, and finally that the plaintiff had better see Judge Shea; that he had the matter of the settlement with the property owners along Fulton street in his hands. He says he went to see Shea a few days thereafter, and told him that he was going to Europe; that they had put him off from time to time; that Goodwin had promised him that they would treat him right.

He says Shea said : " I understand all that. Now you can go right along to Europe, and you will be paid the same as we paid the other Fulton street property owners; as much as we have paid the others we will pay you. I asked him about ten per cent of the valuation, and he said ten per cent was the highest they had been paying.

Then he went to Europe, and on his return he saw Goodwin again; he said they had no money; that " We will sweep up here, and if there is anything left we are going to do something for you."

He says he then commenced a suit to enjoin the road.   That was in December, 1887.   The plaintiff further testified that in the latter part of 1888 he went with his attorney to a law office in New York city, and had a conversation with Judge Shea, who told him that he was ready to settle the plaintiff's case and any others; that he wanted to have the argument in the condemnation proceedings in the Court of Appeals postponed.   This is the plaintiff's language :

" The case was coming on at Albany, and it came up at the same time the Union Elevated railroad case was to come up, and I was to be paid, no matter how my case went, as much as anybody on Fulton street had been paid.   That was his argument all through. I was to receive as much as anybody on Fulton street had been paid. The rate per cent was named.   Ten per cent of the assessed valuation of my property.   I told him how much the assessed valuation of my property was, to wit, $90,000.   He said he would pay me $9,000, ten per cent on that.   I said that anything my attorney assented to I would do."

That completed the testimony of the plaintiff on his direct examination, and it was not varied upon his cross-examination, except so as to make it somewhat doubtful whether the $9,000 spoken of was for the adjournment or the damages.   We shall assume in the further consideration of the case that it was for the latter, and that will obviate the necessity of an examination of that question, and do the plaintiff no injustice.   There is nothing in the testimony which tends toward the formation of an agreement with the plaintiff down to the second interview between him and his counsel with Judge Shea in the latter part of the year 1888.   Let us see.   The unknown man who procured the plaintiff's signature to the consent before referred to said that the company would pay the plaintiff if it paid any others.   That was a promise.   Who made it ?   There is no proof either of his identity or his status.

Can liability be imposed upon a corporation in that way ?   The admission of the testimony was plainly erroneous unless the authority of the person to make the statement was to be thereafter shown, and as that was not proven the testimony can have no effect in the action.

In the first conversation with Goodwin he said nothing of importance except that the company would treat the plaintiff fairly.   In

the second conversation he referred the plaintiff to Judge Shea, who said nothing about payment, except that ten per cent was the highest the company had paid. In the second conversation with Goodwin he said that if there were anything left they were going to do something for the plaintiff. In the second conversation with Shea, in the presence of the lawyer of the plaintiff, Shea said he would pay the plaintiff $9,000, and the plaintiff then said, anything his attorney assented to he would, and his attorney gave no consent. That testimony fails to prove an agreement.

At most all Judge Shea said constituted only an offer which was not accepted, and in his cross-examination the plaintiff gave the reason why he did not accept the offer. He said: "Judge Shea agreed to give ten per cent, the same as the others. I was going to try and find out if there was anybody who got twenty per cent; if there was, I wanted twenty per cent. He was going to give me as much as anybody else." The plaintiff did not intend to close with Judge Shea at that time. He intended to ascertain if any one had gotten twenty per cent, and if there were he wanted the same. Yet he never saw Judge Shea thereafter, and never accepted his offer in any way, and he did not find that any one had received twenty per cent or ten per cent.

It does not appear that any one was paid anything. Even between Judge Shea and the plaintiff, therefore, their minds never met. No arrangement between them ever received the assent of both parties, and that essential requisite to a valid contract is entirely wanting in this case.

Moreover, there is no proof of authority vested in Judge Shea to make any agreement that would be binding upon the company. He was a lawyer, and acted as such for the defendant, but in that capacity he had no power to make contracts, and the plaintiff failed to show that he sustained any relation to the company that authorized him to make or accept any proposition which could be enforced against the company. Neither was there any proof that the company ever acquiesced in or ratified any act done or promise made by Shea in this or any other matter. There is no evidence in the case to show any action by the company in relation to the plaintiff or his property, and it cannot be made responsible without proof of corporate action of some sort, and the absence of any such action is

an insurmountable obstacle in the pathway of the plaintiff. The plaintiff could not rest upon the simple offer or promise of Shea. He was bound to know the extent of his authority (*Jemison* v. *Citizens' Savings Bank,* 122 N. Y. 140; *Wilson* v. *Kings County Elevated Railroad Co.,* 114 id. 487); nay, more; he was bound to prove his authority (*Martin* v. *Farnsworth,* 49 N. Y. 555), or a ratification of his acts by the company, and he made no effort to do either. Plainly, therefore, the testimony failed to prove an agreement by the defendant, and the verdict is entirely destitute of support.

We are requested to spare this verdict because it is the second one that has been rendered in favor of the plaintiff in this action, and there are cases where such a plea has been respected.

In fact, judges have said that they interfere with the verdicts of juries with hesitation, but such reluctance is the product of education and not of reason.

A respect amounting almost to veneration for trial by jury has been inculcated upon the minds of lawyers and judges. It has been the theme of unbounded panegyric and exalted encomium. It has been termed the palladium of civil rights. Judge BLACKSTONE bestowed upon it an extravagant eulogium. But in his own country, throughout the reigns of Queen Elizabeth and her predecessor and successor on the throne, the juries rarely withstood the crown lawyers and the partisan judges.

The historian Hume says: " There scarcely occurs an instance during these reigns that the sovereign or the ministers were ever disappointed in the issue of the prosecution." Instead of standing between the crown and the accused, the juror " sought his own safety in the surrender of his victim."

In this country the experience in criminal prosecutions has been the converse, and verdicts of acquittal have been the theme of just criticism.

Modern times have witnessed an unwonted increase in the number of actions for negligence against corporations, and experience and observation teach us that those suits are instituted in reliance upon the disposition of juries to find verdicts against corporate bodies. That disposition is the weak point in the jury system, and with the knowledge of its existence the appellate courts are called upon to

scrutinize verdicts which are destitute of support in the evidence, or which are against the preponderance of proof, even though they are the second of their kind. Appellate tribunals cannot abdicate their functions; the law has clothed them with the power of review, and it should be exercised with freedom.

Like all human tribunals, a jury is liable to err. Jurors take no notes of testimony; they rely upon their memory, and their conclusions are usually reached in a few hours. Misconception is liable to ensue from a want of time for deliberation.

In actions against corporations the verdicts of juries are often unsatisfactory, and plainly the result of misconception, prejudice or partiality.

We see no reason why the review of a judgment based upon the verdict of a jury should be approached or conducted with hesitation.

The power vested in this court is unlimited, and what has been said is sufficient to show that it should be fearlessly exercised. There is little danger that a judgment will be reversed by an appellate court, upon a question of fact, where it is supported by evidence, whether it be based upon the verdict of a jury or the decision of any other tribunal.

A careful examination of this case under the control of the usual respect entertained for the verdict of a jury leads us to the conclusion that the verdict is unsupported by the evidence, and the judgment and order denying the motion for a new trial should be reversed and a new trial granted, with costs to abide the event.

PRATT, J., concurred; BROWN, P. J., not sitting.

Judgment and order reversed and new trial granted, costs to abide the event.