COSTIGAN v. METROPOLITAN LIFE INS. CO. et al.

(Supreme Court, Appellate Division, Fourth Department.   March 22, 1899.)

1. MALICIOUS PROSECUTION—PROBABLE CAUSE—MALICE—QUESTION FOR JURY.
    After an insurance solicitor had quit his employment with defendant company, and commenced work for another company, in the same business, the defendant's attorney wrote him a letter, stating that the collection of a deficiency in his accounts had been placed in his hands, and demanding an immediate settlement. An agent of the company requested the solicitor to repay him a loan, and, on being refused, told him that they would fix him, and on the following day the solicitor was arrested for embezzlement in failing to account for a premium collected by him. The surety on the solicitor's fidelity bond offered to pay any actual debt found due the company, and the solicitor denied being short in his accounts. The superintendent of the company stated that they did not care much for the money due, but wanted to punish the solicitor for his defalcation. The proceedings were instituted without inquiring of the policy holder whether he had paid the solicitor the premium in question, though the company and its superintendent knew that under the system of paying its solicitors they frequently advanced premiums, and reported them as paid, when in fact they had not yet been paid. *Held*, that the question of defendant's malice and probable cause for the arrest was for the jury.

2. SAME—EVIDENCE.
    On an issue whether a prosecution, by an insurance company and its officers, of its solicitor, for an alleged embezzlement of premiums collected, was malicious and without probable cause, evidence that the solicitor was in the habit of reporting premiums paid, and advancing money for them, before the policy holder in fact paid them, is admissible.

Appeal from trial term, Erie county.

Action by Edward H. Costigan against the Metropolitan Life Insurance Company and others. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

The complaint alleges that the defendant is a corporation organized under the laws of the state of New York, engaged in the business of life insurance at Buffalo and other places, and that the defendant Bernstein was an agent, and that the defendant Staniland was a superintendent, of the said company; that on the 7th of February, 1895, the defendants, maliciously intending to injure the plaintiff and maliciously contriving to falsely charge this plaintiff with having stolen certain moneys, caused Bernstein to make to a police justice in the city a complaint and charge against the plaintiff, without any probable cause, to the effect that the plaintiff did "unlawfully and wrongfully steal, take, and convert to his own use $3.72, which had come into his possession as the property of the Metropolitan Life Insurance Company." It is further averred that the defendants maliciously, and without probable cause, procured the said police justice to grant a warrant for the arrest of the plaintiff upon the charge of petit larceny; that a warrant was issued, and the plaintiff was arrested and imprisoned under the same for the space of four days in the

57 N.Y.S.—12

county jail of Erie county and in the station house known as "No. 1," in the city of Buffalo, when he was compelled, by persuasions and inducements of the defendants and their attorneys, to give bail or go to jail. It is alleged that Judge Green granted a certificate that the said charge of petit larceny be submitted to a grand jury, and the prosecution be by indictment. It is alleged that the defendants, further intending to injure this plaintiff, appeared before the grand jury of Erie county, and prosecuted said false complaint, and the charge was examined by the grand jury, "whereupon this plaintiff was adjudged not guilty of said charge, and no bill of indictment was reported by said grand jury after such investigation, and this plaintiff was fully acquitted of and discharged from the same." It is alleged that the defendants caused it to be widely reported "that the plaintiff had been arrested as a thief." The defendants answered, and set up in justification several transactions in which the plaintiff had been engaged while acting for the insurance company, and also made several denials of the allegations of the complaint; the insurance company stipulating at the trial to stand on an answer similar to the one served by the defendant Staniland.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, and Mc-LENNAN, JJ.

Edward A. Simons, for appellants.

Leroy Andrus, for respondent.

HARDIN, P. J. Evidence was given upon the trial that Bernstein, one of the defendants, lodged an affidavit with a police justice of the city of Buffalo, wherein it was stated that the plaintiff "did unlawfully and wrongfully steal, take, and convert to his own use $3.72, which had come into his possession as the property of the Metropolitan Life Insurance Company of New York, a corporation." Upon that affidavit the police justice issued a warrant requiring the apprehension of the plaintiff, and reciting that an information had been made charging "that the crime of petit larceny had been committed, and accusing Edward H. Costigan thereof." Evidence was also given that on the warrant he was, on the 8th of February, 1895, arrested, and taken to the police court, and that the prosecution so instituted was terminated before the commencement of this action. The insurance company carried on the business on what was commonly called the "Industrial Plan," and the defendant Staniland was its general superintendent in Buffalo, and the defendant Bernstein was an assistant superintendent under Staniland. The plaintiff entered the employment of the defendant as an insurance solicitor in December, 1893, and remained a short period of time, and subsequently was employed again in the same capacity, and remained in the employment of the defendant until December 3, 1894. He then became agent of another company, engaged in the same kind of business. After the plaintiff had accepted employment in another company, to wit, in the Industrial Benefit Life Association, a controversy arose in respect to plaintiff's account in relation to the defendant insurance company, and on February 1, 1895, the attorney of the insurance company addressed a letter to the plaintiff, apprising him that there had been placed in the hands of the attorney "the collection of the deficiency in your agency." The letter further stated, viz.:

"I do not care to take any harsh measures, and have written your bondsmen asking for an appointment with you in my office next week, Monday morning,

I do not care to make any statement from your books, as I have all the papers, and am familiar with these cases, and can explain to Mr. Button [who was plaintiff's surety] and yourself fully any doubts which may exist in your mind; but I am inclined, if you will settle at once, to take the actual amount which I know you have taken in cash from the company."

Subsequent to the plaintiff's receiving that letter, the proceedings for his arrest were instituted. The defendant Bernstein met the plaintiff before the proceedings were instituted, he then being in the employ of the defendant insurance company under the defendant Staniland, and Bernstein addressed to the plaintiff the following language: "Mr. Costigan, I want to see you a minute," and added "How is it about that four dollars I loaned you?" The plaintiff replied, "What four dollars?" and added, "You mean the four dollars you put into the account?" Then Bernstein said, "Yes." Some further conversation ensued, when Bernstein turned to the plaintiff, and says, "You won't pay it?" The plaintiff said, "No, sir." Thereupon Bernstein said, "I will fix you," to which the plaintiff replied, "What do you mean?" Bernstein said, "Well, we will fix you;" and the next day the plaintiff was arrested at his home, and taken to the police headquarters in a coal wagon, and from there to the jail, where he was kept until the following Monday, February 11th, and he was then taken to the police court, where the defendant Staniland and Bernstein and the attorney of the company were assembled, and they resisted an adjournment of the proceedings.

In the contract entered into by the plaintiff with the insurance company as to the business relations he was to sustain to the company, the plaintiff was made to stipulate, viz.:

"My compensation shall be of two kinds,—one known as the 'ordinary salary,' and the other as the 'special salary.' The ordinary salary shall be fifteen per cent. on the amount actually collected by me each week and paid to the company. The special salary shall be fifteen times the amount of the net weekly increase of collectible debit in my agency. Net increase of collectible debit is the excess of new business obtained by and credited to me over policies lapsed and charged against me on the books of the company, either during the continuance of my agency or within six weeks after the official transfer in the books of the company of the business of my agency: provided, however, the payment of said salary is subject to the following conditions: That I shall not be entitled to a special salary exceeding fifteen dollars per week, without special agreement, until my business is shown to be in all respects satisfactory to the company; and should my accounts show, in the opinion of the company, disproportionately small collections, or should the debit be decreasing by lapses, or the balance due company be beyond the prescribed limit, the payment of any special salary shall be optional with the company."

It is observable that by the terms of the stipulation just quoted solicitors were reluctant to allow any policies to lapse, and certain expedients were resorted to to keep the policies alive. There was evidence given tending to show that on some occasions the plaintiff included his commissions in his reports, with a view of keeping up the appearance of his business being prosperous, and that he was led to do that by the defendant Staniland intimating to him that he would be appointed assistant superintendent of the company. Plaintiff testified as a witness, viz.:

"I put in my commission frequently with the intention of having, as he told me, 95 or 96 per cent., and I would get my promotion. That is how I come

to put in money to people I had never received.   That is what I meant by false statements."

In the course of the business the inspection of the accounts was had by the assistant superintendent of the company.   The mode of swelling the accounts was further explained by the evidence as follows:

"We start out to make collections, and during the time I was with the company, it was hard to collect money.   I went out on Monday morning, and it was almost impossible to turn in the one hundred per cent. you are expected to.   If you didn't make the one hundred per cent. collections,—the full amount of your debit on your collection book, as the plain language is,—you went behind on your collections, and that is what is called the balance sheet.   I could see it was important, if I ever expected to get a promotion, that I should have good collections; and the only way to make collections good was to put money into my account, out of my own pocket, which I got for commission, as I got a commission of fifteen per cent.   *   *   *   The policy would lapse if the person insured neglected to pay insurance for four weeks.   In that case the collector has to pay one week of it, and another week during transmission. They charge two weeks against the agent of money he never received."

Further evidence was given illustrating the mode of transaction of the business between the plaintiff, the superintendent, and the insurance company, tending to show that a custom prevailed among the solicitors of swelling their accounts, which was known to the company or its officers.   The system in vogue induced the solicitor to credit a policy holder with payment before it was actually made, taking care to select a prompt and solvent policy holder from whom he had reason to expect afterwards to collect the amount, which, when paid, would belong to the solicitor.   The plaintiff claims that under the custom thus established he was induced to report having received $2.20 from one Therrien.   Under the custom prevailing, it was not always that the policy lapsed when four weeks in arrears.   There was, however, some conflicting evidence in respect to the transactions relating to what was called "swelling the accounts."   It appeared in the evidence that at the time the plaintiff entered into the employment of the insurance company he was required to, and did, give a bond with a surety, and it would seem from the evidence that, after the plaintiff took employment in a rival company, he was charged with irregularity, and with having in his hands a greater sum of money than he actually had, and the deficiency alleged against him was overstated; and the surety who called to see about the alleged irregularities was told by the defendant Staniland, viz., "They do not care so much for the money in question as to punish Costigan for his defalcation;" and the surety made repeated applications for a statement of the account.   It appears by the evidence that before the proceedings were instituted in the police court no one applied to Therrien for information as to whether Costigan had collected the money from him (Therrien).   There is some evidence tending to show that Costigan denied that he was indebted to the insurance company, and his surety stated a willingness to pay any actual debt that might be found due to the company, if, upon a reasonable statement made thereof, the amount could be ascertained.   The plaintiff had made some collections at the instance of Bernstein, for which he had not received pay.   Much fur-

ther evidence was given touching the relations of the plaintiff to the insurance company and the business carried on by it, not necessary to elaborate in a statement of the principles that must be observed in the determination of the case now in hand. It was, upon all the evidence, a question of fact whether the prosecution of the plaintiff was instituted without probable cause, and, there being conflict in the evidence bearing upon that subject, the trial judge properly submitted the question to the jury, and refused to grant a nonsuit.

In Heyne v. Blair, 62 N. Y. 19, it was said:

"Although, in an action for malicious prosecution, the burden is upon plaintiff to prove a want of probable cause for the prosecution, and although the evidence is uncontradicted, yet, if the facts proved are capable of different inferences, it is for the jury to determine what, under the circumstances, would be the belief and action of men of ordinary prudence; and a refusal to submit the case to the jury is error. This class of actions forms no exception to the general rule."

In that case the court had directed a verdict for the defendant, and it was held error, and it was further held, viz.:

"That the evidence was not of that conclusive character justifying a withdrawal of it from the jury, but it was for them to determine the effect all the information and knowledge in defendant's possession would have had upon the mind of a person of ordinary prudence and caution acting conscientiously."

In Wass v. Stephens, 128 N. Y. 127, 28 N. E. 21, in the course of the opinion, it was said:

"The question of probable cause may be a question of law for the court, or of fact for the jury, depending upon the circumstances. If the facts are undisputed, and admit of but one inference, the question is one of law. If disputed, or if capable of opposing inferences, the question is for the jury."

We think the learned trial judge properly dealt with the evidence in his instructions to the jury upon the question of want of probable cause, and that the verdict in that regard should be accepted.

We see nothing in Willard v. Holmes, 142 N. Y. 497, 37 N. E. 480, which aids the contention of the defendant, as in that case it was said in the course of the opinion, viz.:

"The material facts were not in dispute, and whether there was probable cause for the prosecution of the former action became a question of law solely for the court;" citing Besson v. Southard, 10 N. Y. 236.

The trial judge fully and fairly submitted to the jury the question of whether the defendants were actuated by malice in instituting the proceedings, as well as the question of want of probable cause. While this court has the power, in reviewing an appeal denying a motion for a new trial upon the minutes, to set aside a verdict as against the weight of evidence, we are not persuaded that the verdict before us is against the weight of evidence upon the important questions of fact which are involved. We think this case differs from Bosko v. Railroad Co., 91 Hun, 320, 36 N. Y. Supp. 261, cited by the appellant. In that case the burden that was cast upon the plaintiff was borne only by himself as a witness, and he was confronted by the testimony of six witnesses.

In accordance with a request of the learned counsel for the appellants we have read the opinion in Nutting v. Railroad Co., 91 Hun, 251, 36 N. Y. Supp. 142, and we concur in the remark made therein,

to wit, "Like all human tribunals, a jury is liable to err." We, how-ever, see nothing in the circumstances of that case which sustains the contention of the appellants. While it is true that some of the evidence given by Costigan as a witness, who was interested as a party, was contradicted upon vital points by the witnesses Graham, Bernstein, Staniland, and others, we are satisfied that the learned trial judge correctly stated what credence should be given to his evidence was for the jury to determine. While the witness Costigan was detailing the manner of keeping the books, and of advancing money for policy holders, an objection was interposed by the de-fendants, which was overruled, and the witness was allowed to state the mode in which he had transacted the business, and the manner in which he had advanced money, and the accounts became swollen. We think the court committed no error in permitting the evidence. The charge was full and clear upon the vital questions in the case, and the jury has solved the conflicts in the evidence in favor of the plaintiff.

Judgment and order affirmed, with costs. All concur.